UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| JAMES KOZLOWSKI, an individual; AND PERRY KOZLOWSKI, an individual; <br><br> Plaintiffs, <br><br> vs. <br><br> GREGORY J. PALMQUIST, an individual; NORTH AMERICAN NATIONAL MARKETING, LLC, a Colorado limited liability company; NANM, LLC, a Colorado limited liability company; GARDINER LIMITED PARTNERSHIP ACQUISITIONS, LLC, a Colorado limited liability company; AVANZAR FINANCIAL GROUP, LLC, a Colorado limited liability company; and JOHN DOE DEFENDANTS 1-5, being any other related person or entity; <br><br> Defendants. | 4:12-CV-04174-KES <br><br><br> MEMORANDUM OPINION AND ORDER |

Plaintiffs, James Kozlowski and Perry Kozlowski, move the court for an order to amend the amended complaint. Defendants, Gregory Palmquist, North American National Marketing, LLC, NANM, LLC, Gardiner Limited Partnership Acquisitions, LLC, and Avanzar Financial Group, LLC, resist the motion. Defendants move the court for summary judgment and for an order imposing

sanctions.[1] The Kozlowskis resist the motions. For the following reasons, the court denies the motion to amend the amended complaint, grants in part and denies in part the motion for summary judgment, and denies the motion for sanctions.

## PROCEDURAL HISTORY

James Kozlowski is a resident of South Dakota, and Perry Kozlowski is a resident of North Dakota. Defendant Gregory Palmquist is a resident of Colorado, and the four defendant entities are Colorado limited liability companies.

The Kozlowskis filed their complaint on October 10, 2012, alleging causes of action for an accounting, breach of contract, fraud and deceit, and tortious interference with a business/contractual relationship. Docket 1. The defendants moved to dismiss the complaint or, in the alternative, to transfer this case to the United States District Court for the District of Colorado. Docket 17. The Kozlowskis sought leave to amend their complaint while the defendants' motion was pending. Docket 21. On August 29, 2013, the court granted the Kozlowskis' motion to amend the complaint but dismissed the fraud and deceit cause of action. Docket 29. The court denied the defendants' motion to transfer venue. *Id.* On October 16, 2013, the court entered a scheduling order setting discovery and pre-trial deadlines. Docket 34.

---

[1] Defendants also requested oral argument pursuant to D.S.D. Civ. LR 7.1. Docket 81 at 1. Because the court can resolve the pending motions without oral argument, defendants' request is denied.

Additional facts will be discussed as those facts relate to the specific motions pending before the court.

## I.     The Kozlowskis' Motion to Amend the Amended Complaint.

### LEGAL STANDARD

Motions to amend the pleadings are ordinarily governed by Rule 15 of the Federal Rules of Civil Procedure. The Rule provides that a party may amend a pleading with "the court's leave," and the Rule directs the court to "freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). But "[i]f a party files for leave to amend outside of the court's scheduling order, the party must show cause to modify the schedule" in accordance with Rule 16(b). *Popoalli v. Corr. Med. Servs.*, 512 F.3d 488, 497 (8th Cir. 2008) (citing Fed. R. Civ. P. 16(b)). Under Rule 16(b), "[a] schedule may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4). The "good cause" requirement of Rule 16(b) necessitates a stronger showing that the movant is entitled to relief than "the more liberal standard" of Rule 15(a). *Morrison Enters., LLC v. Dravo Corp.*, 638 F.3d 594, 610 (8th Cir. 2011) (quoting *Sherman v. Winco Fireworks, Inc.*, 532 F.3d 709, 716 (8th Cir. 2008)). "Thus, a moving party must first make the requisite [good cause] showing. Even then the district court retains discretion as whether to grant the motion." *Bradford v. DANA Corp.*, 249 F.3d 807, 809 (8th Cir. 2001) (explaining that "[a]s a vehicle designed to streamline the flow of litigation through our crowded dockets, we do not take [scheduling] orders lightly, and will enforce them").

"What constitutes good cause sufficient to justify the modification of a scheduling order necessarily varies with the circumstances of each case." 6A Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure*, § 1522.2 (3d. ed) (hereinafter Wright & Miller). In *Sherman*, the Eighth Circuit explained the contours of the "good cause" standard as follows:

> The primary measure of good cause is the movant's diligence in attempting to meet the order's requirements. *Rahn v. Hawkins*, 464 F.3d 813, 822 (8th Cir. 2006); *see also* Fed. R. Civ. P. 16(b), advisory committee note (1983 Amendment) ("[T]he court may modify the schedule on a showing of good cause if it cannot reasonably be met despite the diligence of the party seeking the extension."). While the prejudice to the nonmovant resulting from modification of the scheduling order may also be a relevant factor, generally, we will not consider prejudice if the movant has not been diligent in meeting the scheduling order's deadlines. . . . Our cases reviewing Rule 16(b) rulings focus in the first instance (and usually solely) on the diligence of the party who sought modification of the order.

*Sherman*, 532 F.3d at 716-17 (alterations in original) (internal citations omitted).[2]

## DISCUSSION

Here, the court's original scheduling order set March 31, 2014, as the deadline to amend the pleadings. Docket 34 at 2. This deadline has not changed. The Kozlowskis filed the pending motion on October 13, 2015, approximately a year-and-a-half after the deadline to amend the pleadings passed. Thus, the Kozlowskis must show "good cause" under Rule 16(b).

---

[2] The *Rahn* decision was abrogated on other grounds. *See Avichail ex rel. T.A. v. St. John's Mercy Health Sys.*, 686 F.3d 548, 552-53 (8th Cir. 2012).

4

The Kozlowskis' original complaint alleged the existence of a business arrangement between themselves, the defendants, and non-party Fox Financial. The basis of the Kozlowskis' fraud and deceit claim involved an allegedly clandestine side-agreement between the defendants and Fox Financial that contravened the parties' original business arrangement. *See* Docket 1 at 6. The court dismissed the fraud and deceit claim because the claim did not comply with Rule 9. *See* Fed. R. Civ. P. 9(b) ("In alleging fraud . . ., a party must state with particularity the circumstances constituting fraud"); Docket 29 at 19 ("Therefore, the court finds that plaintiffs failed to state with particularity the circumstances constituting the alleged fraud and deceit."). More specifically, the court found that the Kozlowskis failed to specify which of the five named defendants bore responsibility for the alleged fraud and deceit. Docket 29 at 18 (explaining that the defendants were "left to guess who was responsible for the alleged fraud and deceit" and that the defendants "were hindered in their ability to respond specifically and quickly to the potentially damaging allegations."). The court dismissed the claim without prejudice. *Id.* at 21.[3]

The Kozlowskis filed as an exhibit a copy of their proposed second amended complaint. Docket 79-1. It contains additional allegations supporting the fraud and deceit claim that were not asserted in the original complaint. For

---

[3] The court granted the Kozlowskis' motion to amend the original complaint so that the amount in controversy with respect to their claims was in excess of $75,000. The court found the Kozlowskis' failure to include the appropriate amount in controversy was inadvertent. Docket 29 at 4. Also, the Kozlowskis moved to amend the original complaint before the court entered its scheduling order. *Id.*

example, the Kozlowskis allege that defendant Palmquist and non-party Daniel Davies secretly met with Fox Financial in October of 2009. *Id.* at 6-7. The Kozlowskis also allege that Palmquist sent an email about the meeting to them later that month but that Palmquist assured them the parties' original business arrangement would continue. *Id.* at 7. But according to the proposed amended complaint, Palmquist's representations were false and the defendants and Fox Financial actually decided to, and did in fact, cut the Kozlowskis out of the business arrangement. *Id.* at 7. The Kozlowskis argue that the new facts underlying their fraud and deceit claim were uncovered through the discovery process. The Kozlowskis contend that they have diligently attempted to comply with the court's scheduling order and that they should be permitted to re-assert their claim for fraud and deceit.

The court disagrees. In *Sherman*, the Eighth Circuit reversed the district court's decision to allow the defendant to add an affirmative defense based on preemption more than seventeen months after the deadline for amending the pleadings passed. *Sherman*, 532 F.3d at 712-13. The Eighth Circuit held that Rule 16(b)'s good cause requirement was not satisfied. *Id.* at 717. The court found that

> Even though preemption is a purely legal defense based on readily available federal law, [the defendant] waited to seek leave to plead the affirmative defense until two and a half years after the suit was filed; a month after the close of discovery; a month after it raised the defense in its summary judgment motion; almost eighteen months after the deadline for amending pleadings; and eight full months after it was actually aware of the preemption defense's applicability.

6

*Id.* at 717. Here, the Kozlowskis were aware of the court's order dismissing their fraud and deceit claim as well as the court's scheduling order. But while the court granted numerous requests from both parties to extend other deadlines in the scheduling order, the Kozlowskis never asked for an extension of time to amend the pleadings. Rather, and similar to *Sherman*, the Kozlowskis did not seek leave to amend until over two years after the court dismissed the fraud and deceit claim without prejudice (Docket 29), one-and-a-half years after the deadline to amend the pleadings lapsed (Docket 34), and nearly a month after the discovery deadline passed. Docket 74. The length of the delay and the Kozlowskis' failure to comply with or seek an extension of the court's scheduling order indicates a lack of diligence. *See Sherman*, 532 F.3d at 718 ("Had [the defendant] been diligent, it would have performed this research at the outset of the litigation, and at least prior to the scheduled deadline for adding affirmative defenses.").

Similarly, in *Popoalli*, the plaintiff moved to amend her complaint almost six months after the court's deadline to do so passed. *Popoalli*, 512 F.3d at 495. Her original complaint alleged that the defendants were deliberately indifferent to her medical needs, and she sought leave to add a claim for negligence. *Id.* at 495-96. She argued that "she decided to add a negligence count only after extensive discovery[.]" *Id.* at 497. The Eighth Circuit found her argument unpersuasive because the facts supporting her negligence claim should have been available to her even without discovery. *Id.* (explaining the overlap between pleading a claim for deliberate indifference and a claim for negligence).

Here, an element of the Kozlowskis' fraud and deceit claim is that they relied to their detriment on representations made by *someone. See N. Am. Truck & Trailer, Inc. v. M.C.I. Commc'ns Servs., Inc.*, 751 N.W.2d 710, 713-14 (S.D. 2008) (providing the elements of a fraud and deceit claim). The court dismissed the fraud and deceit claim because the Kozlowskis did not allege with specificity which of the five named defendants committed the tortious conduct. The Kozlowskis contend that they could not sufficiently plead a claim for fraud and deceit until engaging in discovery. But like in *Papoalli,* the deficiency this court identified when it dismissed the Kozlowskis' claim should have been knowable and curable even without discovery. The Kozlowskis' renewed claim alleges that they relied to their detriment on representations emailed to them by defendant Palmquist. But that email was allegedly sent to the Kozlowskis in 2009. If so, then the email, as well as the identity of its sender, should have been available to the Kozlowskis at the outset of this litigation. *Cf. Barstad v. Murray Cty.*, 420 F.3d 880, 883 (8th Cir. 2005) (finding a lack of good cause and noting that "the Barstads knew of the claims they sought to add when they filed the original complaint[.]") Thus, the court finds that the Kozlowskis did not diligently attempt to comply with the court's scheduling order.

Additionally, even if the Kozlowskis had acted diligently, the court finds that the defendants would be unfairly prejudiced by allowing the Kozlowskis to now amend. The Kozlowskis waited until nearly a month after the discovery deadline passed before filing their motion. Granting the motion would require reopening discovery on the fraud and deceit claim and it would necessitate

8

further delay in a case that is already over three years old. The Eighth Circuit identified the need to conduct additional discovery and further delay as "precisely the sort of prejudice that justifies denial of a motion to amend" a complaint. *In re Milk Prods. Antitrust Litig.*, 195 F.3d 430, 438 (8th Cir. 1999). The prejudice flowing to the defendants is an independently sufficient reason that justifies the denial of the Kozlowskis' motion to amend their complaint. Thus, the Kozlowskis' motion to amend is denied.

## II.      Defendants' Motion for Summary Judgment.

### BACKGROUND

The facts viewed in the light most favorable to the Kozlowskis, the non-moving party, are as follows:

Palmquist is a member of North American National Marketing, LLC (North American); NANM, LLC; and Gardiner Limited Partnership Acquisitions LLC. Non-party Robert Meek is a member of NANM, LLC, and Gardiner. Non-party Daniel Davies worked for North American prior to forming and acting as principal of Avanzar Financial Group, LLC. Davies also performed brokerage services for Gardiner before forming Avanzar, although Davies was not considered an employee of Gardiner. Davies continued to send emails from North American and Gardiner email addresses after forming Avanzar and Avanzar/Davies shared office space and a computer server with the other defendants.

Palmquist, Davies, and Meek knew Perry Kozlowski for many years as a field representative of the Transamerica Life Insurance Company. James

9

Kozlowski was employed by Bison Enterprises, LLC, as a life settlement broker. James was the sole member of Bison. In January 2007, Perry introduced James to Palmquist, Davies, and Meek, so that James could work on transactions involving life settlements with them.

Life settlements involve the sale of a life insurance policy from the insured to a third-party. The insured seeks to sell the policy for more than the policy's surrender value but less than its face value or death benefit. In return, the third-party assumes responsibility for paying the premiums but receives the death benefit upon the death of the insured. The third-party can treat the policy as an investment, allow the policy to lapse, or attempt to sell the policy to another buyer.

The value of a life insurance policy is based on a number of variables, including the health and life expectancy of the insured, the amount of the death benefit, and the cost of paying the premium over the insured's lifetime. Another variable is the presence of a so-called "shadow account" on certain life insurance policies. The shadow account is a secondary guarantee that will keep the policy in force and prevent the policy from lapsing in the same manner as if the policyholder continued to pay the premiums. The payment required to keep the shadow account operative, however, can be lower than the payment required to satisfy the premium. Thus, the policyholder can forego some of the costs of maintaining the policy if he or she knows about and utilizes the shadow account.

The valuation of a shadow account, like the valuation of the life insurance policy itself, is complex. Palmquist, along with other representatives from Gardiner, established a consulting business for owners and/or potential purchasers of life insurance policies. One of Gardiner's services involves analyzing a policy and opining as to its value, a calculation that includes an assessment of the shadow account if one is present. Gardiner receives a consulting fee that is equal to 20% of the policy's increase in value if the customer owned or purchased the policy in a life settlement transaction.

Non-party James Rooney is the sole principal of non-party Fox Financial Management. Fox Financial acquires life settlement policies as assets. Rooney was also an officer of non-party Fox Life, Inc., along with non-party Larry Tuttle. Fox Life is an issuer of securities. In 2008, Tuttle formed Morningstar Settlements to acquire life settlement policies.

On July 6, 2008, James met Rooney in South Dakota. James and Rooney executed what was styled as a mutual confidentiality agreement. James signed the agreement on behalf of Bison and Rooney signed the agreement on behalf of Fox Financial. Sometime after this meeting, James introduced Fox Financial to the defendants.

Between May and September of 2008, the Kozlowskis and the defendants discussed entering a business arrangement. The arrangement was never memorialized in writing. According to the Kozlowskis, however, the parties reached an agreement or understanding wherein they received compensation

for bringing potential purchasers of life settlements to the defendants who then consulted with the purchasers and closed on the transactions.

In October 2009, Palmquist and Davies met with Rooney at Rooney's office in Texas. The Kozlowskis were unaware that this meeting took place. In December 2009, non-party GLP Settlement Solutions was formed by North American National Re-Insurance Company, a North American-related life insurance company. The purpose of GLP was to invest in life settlement policies, and it purchased 33 policies over time. Several of those policies were sold to Fox-related entities or Morningstar. The Kozlowskis were not compensated for these transactions.

## LEGAL STANDARD

Summary judgment on all or part of a claim is appropriate when the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also In re Craig*, 144 F.3d 593, 595 (8th Cir. 1998). The moving party can meet its burden by presenting evidence that there is no dispute of material fact or that the nonmoving party has not presented evidence to support an element of its case on which it bears the ultimate burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Once the moving party has met this burden, "[t]he nonmoving party may not 'rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial.' " *Mosley v. City of Northwoods, Mo.*, 415 F.3d 908, 910 (8th Cir. 2005) (quoting *Krenik v. Cty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir.

1995)). "Further, 'the mere existence of some alleged factual dispute between the parties is not sufficient by itself to deny summary judgment. . . . Instead, the dispute must be outcome determinative under prevailing law.' " *Id.* (quoting *Get Away Club, Inc. v. Coleman*, 969 F.2d 664, 666 (8th Cir. 1992)). The facts, and inferences drawn from those facts, are "viewed in the light most favorable to the party opposing the motion" for summary judgment. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

## DISCUSSION

### A.    Breach of Contract Claim

#### 1.    Can the Kozlowskis rely on an implied contract theory?

It is undisputed that the parties did not enter into a written contract governing their relationship. The Kozlowskis argue that an oral or implied contract exists, however, and that the defendants breached that contract. The defendants argue that the Kozlowskis did not plead a cause of action for breach of an implied contract and that they cannot pursue the theory now.

In South Dakota, a breach of contract claim has three elements: (1) a binding contract; (2) a breach of the contract; and (3) resulting damages. *Guthmiller v. Deloitte & Touche, LLP*, 699 N.W.2d 493, 498 (S.D. 2005). A contract can either be express or implied. SDCL 53-1-3. An express contract is "one, the terms of which are stated in words," whereas "[a]n implied contract is one, the existence and terms of which are manifested by conduct." *Id.* The amended complaint states as a cause of action that the defendants are liable

13

for breach of contract. The amended complaint does not state whether the alleged contract is express or implied. But a contract is still a contract regardless of whether it is express or implied. *St. John's First Lutheran Church in Milbank v. Storsteen*, 84 N.W.2d 725, 727 (S.D. 1957) ("There is no distinction in legal effect between an express contract and an implied contract."). Thus, the court concludes that the Kozlowskis are not precluded from arguing that their contract was an implied contract.

The South Dakota Supreme Court has held, however, that a party cannot recover on both an express and an implied contract theory concerning the same set of facts. *Eberle v. Siouxland Packing Co., Inc.*, 266 N.W.2d 256, 258 (S.D. 1978). Rather, "[o]nly when parties do not expressly agree will the law intercede and determine whether the conduct of the parties has created an implied contract." *Aberle v. City of Aberdeen*, 718 N.W.2d 615, 621 (S.D. 2006). "If, in fact, a valid express contract exists, which establishes the rights of the contracting parties, [then] no implied contract will be or need be inferred." *Weller v. Spring Creek Resort, Inc.*, 477 N.W.2d 839, 841 (S.D. 1991). Thus, the issue is whether an express contact exists and, if not, then whether an implied contract was formed.

## 2. Did the parties have an express, oral contract?

"The existence of an express contract is a question of law[.]" *Humble v. Wyant*, 843 N.W.2d 334, 343 (S.D. 2014). "An express contract results when the parties mutually express an intent to be bound by specific terms and conditions." *Weitzel v. Sioux Valley Heart Partners*, 714 N.W.2d 884, 892 (S.D.

14

2006). For an express, oral contract to be enforceable, its essential terms must be "sufficiently definite to enable a court to give it an exact meaning." *Id.* " 'However, absolute certainty is not required; only reasonable certainty is necessary.' " *Id.* (quoting 17A Am. Jur. 2d *Contracts* § 196 (1991)). But "[w]here there is no showing that the terms of an alleged oral agreement were ever settled or agreed upon, it is proper for the trial court to make a summary finding against the existence of a contract." *Owens v. Moyes*, 530 N.W.2d 663, 665 (S.D. 1995); *see also Werner v. Norwest Bank S.D., N.A.*, 499 N.W.2d 138, 141 (S.D. 1993).

The nucleus of the Kozlowskis' express contract theory consists of the Kozlowskis receiving compensation in the past for life settlement transactions between the defendants and Fox Finacial-related entities and/or Morningstar. Perry testified that he believed an agreement between the parties was finalized in May of 2008. Docket 86-2 at 17. James testified that he believed the agreement was finalized sometime between May and August of 2008. Docket 86-3 at 8. Perry and James both testified that they believed the agreement would last into perpetuity. Docket 86-2 at 13; Docket 86-3 at 13. Palmquist, in contrast, testified that the arrangement was fluid and "subject to constant negotiation as opportunities emerged and changed," and he could not articulate a natural start or end point for the agreement. Docket 85-9 at 23.

In terms of the parties to the agreement, Perry testified that the parties included himself, James, Palmquist, North American, North American National Re-Insurance, GLP, Avanzar, Davies, and Meek. Docket 86-2 at 15, 23. James

testified that the parties included himself, Palmquist, Meek, Davies, and "whoever else they represented in the organization." Docket 86-3 at 10. James testified that he was led to believe that Palmquist represented all of the defendant entities and that the agreement was with the defendants "collectively." *Id.* at 12, 24. Palmquist testified that the arrangement was with Perry and James. Docket 85-9 at 18. He explained that "we" were responsible for the consultation work but that Avanzar was responsible for acting as a broker. *Id.*

As to the scope of the agreement, the Kozlowskis insist that they should receive 20% of the consulting fees and 50% of the brokerage fees derived from certain transactions involving life settlement policies with Fox Fiancial or Morningstar. Docket 86-2 at 21; Docket 86-3 at 13. Perry also testified that the Kozlowskis should be entitled to at least a 20% share on a life settlement policy sold to Fox Financial or its related entities if the policy's value increased even if the defendants did not perform a consultation service. Docket 86-2 at 31. For example, if the policy's market value increased through a sudden decline in the insured's life expectancy, and the policy was then sold to Fox Financial, Perry believed that the Kozlowskis would be entitled to "market compensation which is much higher than 20 percent." *Id.* Perry also testified the compensation arrangement applied to any business that took place between Fox Financial, its related entities, and the defendants. *Id.* at 24. He retreated from that position, however, and agreed that it would not apply to all transactions involving Fox Financial. *Id.* at 29. For example, if Rooney purchased a personal life insurance

16

policy directly from the defendants or a piece of real estate, the agreement would not apply. *Id.*

James testified that the 20% consulting fee would apply when the defendants' evaluation of a policy resulted in an increase in the policy's value due to the presence of a shadow account. Docket 86-3 at 13. When James was presented with the scenario given to Perry that involved a sudden decline in the insured's health, James testified that the Kozlowskis would not be entitled to a portion of that increase in value. *Id.* at 26-27. James also testified that he had an agreement with Palmquist that involved James locating a policy in the marketplace so "that [James] could bring these policies in where we could scrub them to make sure there was no fraudulent basis of how they were originated and to make sure they were regulatory-compliant." *Id.* For that service, "that's where the compensation agreement was in place." *Id.* Palmquist testified that there was not a single, oral agreement that dictated the terms of the defendants' relationship with the Kozlowskis. Docket 85-9 at 57. He also testified that "[w]e had many agreements that no business ever came of and many opportunities where we never came to an agreement on what the compensation split would be[.]" *Id.* at 24.

Regarding the party responsible for the Kozlowskis' compensation, Perry testified that he did not know which defendant was responsible for making payments because he never received any direct compensation from them. Docket 86-2 at 9. Rather, Perry was compensated through James. *Id.* James testified that he was not sure which party was responsible for payment, either,

17

because he claimed to have received compensation from North American, Gardiner, and through an undisclosed wire transfer. Docket 86-3 at 10. James also testified that Avanzar was responsible for making payments in certain circumstances. Docket 86-3 at 13. Palmquist testified that some of the payments were made by Gardiner and some originated through Avanzar but were made by North American. Docket 85-9 at 18.

The court finds there was no mutual expression of an intention to be bound by specific terms and conditions between the parties. The parties expressed different opinions on the duration of the agreement, the number and names of the parties to the agreement, the types of transactions to which the Kozlowskis were entitled compensation under the agreement, and the identity of the party that was responsible for paying the Kozlowskis. Because a number of the essential terms of the oral agreement are left open or otherwise insufficiently definite, this court cannot give the agreement an exact meaning. Thus, the court finds that the parties did not have an express contract.

### 3.    Did the parties have an implied contract?

Although the parties did not have an express contract, "[t]he absence of an express contract does not . . . foreclose the possibility of a contractual relationship, because the parties may, by their acts and conduct, create an implied contract." *Jurrens v. Lorenz Mfg. Co. of Benson, Minn.*, 578 N.W.2d 151, 154 (S.D. 1998). The South Dakota Supreme Court has held that

> A contract is implied in fact where the intention as to it is not
> manifested by direct or explicit words by the parties, but is to be
> gathered by implication or proper deduction from the conduct of
> the parties, language used, or acts done by them, or other

18

pertinent circumstances attending the transaction.

*Weller*, 477 N.W.2d at 841 (quoting *Mahan v. Mahan*, 121 N.W.2d 367, 369 (S.D. 1963)). "[T]he totality of the parties' conduct [is examined] to learn whether an implied contract can be found." *In re Regennitter*, 589 N.W.2d 920, 924 (S.D. 1999). The " 'facts are viewed objectively and if a party voluntarily indulges in conduct reasonably indicating assent he may be bound even though his conduct does not truly express the state of his mind.' " *Id.* (quoting *Federal Land bank of Omaha v. Houck*, 4 N.W.2d 213, 219-20 (S.D. 1942)). And unlike the existence of an express contract which is a question of law, " '[t]he existence and governing terms of an implied contract present questions of fact to be decided by a jury.' " *Holland v. FEM Elec. Ass'n, Inc.*, 637 N.W.2d 717, 719 (S.D. 2001) (quoting *Jurrens*, 578 N.W.2d at 154).

Here, the record shows that Avanzar brokered the sale of three policies to Morningstar in November 2008 that insured the life of Ruth Anderson. Docket 89-2. Palmquist testified that the Kozlowskis, through Bison, received a 50% share of the brokerage fees received by Avanzar through North American. Docket 85-9 at 19. A bank statement from North American shows that two wire transfers totaling $21,505 were made to the Kozlowskis. Docket 89-5. Palmquist also explained that Gardiner performed consulting work for Morningstar on one of the Anderson policies. Docket 85-9 at 19. Gardiner then paid the Kozlowskis 20% of the fee assessed by Gardiner for its consulting services. *Id.* A Gardiner bank statement shows that a wire transfer of $26,400 was made to the Kozlowskis. Docket 89-4.

The record also shows that Fox Financial purchased three policies insuring the life of John Osborne in 2009. In April of 2009, Gardiner performed consulting work for Fox Financial on one of the policies. Docket 89-6. Gardiner received $133,333.96 from Fox Financial. *Id.* Gardiner made two wire transfers to the Kozlowskis, through Bison, in May of 2009. Docket 89-7. One of the transfers was made on May 28, 2009, in the amount of $26,666.67. *Id.* The other transfer was made on May 29, 2009, in the amount of $7,223.00. *Id.* Palmquist testified that the May 28 transfer was for the Kozlowskis' share of the consulting fees and the May 28 transfer was for the Kozlowskis' share of the brokerage fees. Docket 85-9 at 21. Unlike with the Anderson policy, the Kozlowskis' brokerage fee payment came from Gardiner rather than North American. According to Palmquist, the policy was brokered by Avanzar. *Id.* The record is not clear, however, as to the amount received in brokerage fees by Avanzar from the sale of this policy.

Gardiner performed consulting work on the second Osborn policy in August of 2009. Docket 89-8. Gardiner received $80,000 for its work. *Id.* Gardiner paid the Kozlowskis $16,000, through Bison, on September 16, 2009, for their share of the consulting fees. Docket 90-1. Palmquist attested that North American did not receive a share of brokerage fees from Avanzar on this policy so the Kozlowskis did not receive a share from North American, either. Docket 85 at 5.

Gardiner performed consulting work on the third Osborn policy in September of 2009. Docket 90-2. Gardiner received $26.666.66 for its work.

Docket 90-3.[4] This time North American paid the Kozlowskis $5,200, through Bison, as their share of Gardiner's consulting fee. Docket 90-4. Palmquist attested that North American did not receive a share of brokerage fees from Avanzar on this policy so the Kozlowskis did not receive a share of North American's fee. Docket 85 at 5.

The defendants argue that if the parties had an enforceable agreement, the agreement was limited to the circumstances exemplified in the Anderson and Osborn transactions. The agreement would not apply if, for example, the defendants purchased a life settlement policy and sold it directly to Fox Financial or another entity. The Kozlowskis disagree. They argue that if Fox Financial or Morningstar is involved in a life settlement transaction with the defendants, then the Kozlowskis were entitled to some measure of compensation.

As to the Anderson and Osborn policies, the parties' conduct suggests an agreement existed between them and that they conducted at least some business under that agreement. The parties' conduct, however, is not entirely consistent. On the Anderson policy, for example, Gardiner paid the Kozlowskis a share of consulting fees and North American paid the Kozlowskis a share of brokerage fees. But on the first Osborn policy, Gardiner paid both the share of consulting fees and the brokerage fees. As for the second and third Osborn policies, Gardiner and North American each assumed responsibility for paying the Kozlowskis a share of consulting fees. Additionally, it is not clear what

_____

[4] The fee schedule identified by defendants that correlates to this policy indicates Gardiner would receive $46,666.66.

brokerage fee Avanzar received from any of the Osborn policies. Palmquist attested that North American did not receive any brokerage fees from Avanzar for the second and third Osborn policies. But it is unclear if Avanzar did not act as a broker for the sale of those policies or if Avanzar simply did not share its brokerage fee with North American. And if Gardiner paid the Kozlowskis their portion of brokerage fees from the first Osborn policy, it is unclear whether North American needed to receive any brokerage fees at all under the agreement for the Kozlowskis to be entitled to a share. Consequently, the precise contours of the agreement are not manifested by direct or explicit words from the parties but must be gathered by implication or deduction from the facts of the case. The totality of the parties' conduct could reasonably indicate that the parties intended to be bound by the terms of an implied contract. Whether an implied contract exists and, if so, its governing terms, are questions of fact for the jury. Thus, the defendants are not entitled to summary judgment on the Kozlowskis' breach of contract claim.

### B.   Tortious Interference

The Kozlowskis allege that they had a valid business relationship or expectancy with Fox Financial.[5] They contend that the defendants tortiously interfered with that relationship or expectancy when the defendants began transacting business with Fox Financial directly and to the exclusion of the Kozlowskis. The defendants argue that summary judgment should be granted

---

[5] The amended complaint also lists Morningstar as an entity with which the Kozlowskis alleged to have a business relationship or expectation. The parties' briefs focus on the Fox Financial relationship.

22

in their favor because the Kozlowskis cannot establish several of the essential elements of their tortious interference claim.

In South Dakota, the elements of a tortious interference with business relationships or expectancy claim are: (1) the existence of a valid business relationship or expectancy; (2) knowledge by the interferer of the relationship or expectancy; (3) an intentional and improper act of interference on the part of the interferer;[6] (4) proof that the interference caused the harm sustained; and (5) damage to the party whose relationship or expectancy was disrupted. *Tibke v. McDougall*, 479 N.W.2d 898, 908 (S.D. 1992). The South Dakota Supreme Court has analogized this cause of action to "a 'triangle' [involving] a plaintiff, an identifiable third party who wished to deal with the plaintiff, and the defendant who interfered with the plaintiff and the third party." *Landstrom v. Shaver*, 561 N.W.2d 1, 16 (S.D. 1997). This is a "factually driven cause of action" and is "dependent on the plaintiff's factual situation." *Hayes v. N. Hills Gen. Hosp.*, 590 N.W.2d 243, 250 n.6 (S.D. 1999). " 'One is liable for commission of this tort who interferes with business relations of another, both existing and prospective, by inducing a third person not to enter into or continue a business relation with another or by preventing a third person from continuing a business relation with another.' " *Id.* at 248 (quoting *N. Plumbing*

---

[6] The South Dakota Supreme Court previously described the third element as involving "unjustified" interference, which was recently modified to require a showing of "improper" interference. *See Gruhlke v. Sioux Empire Fed. Credit Union, Inc.*, 756 N.W.2d 399, 408 (S.D. 2008).

& *Heating, Inc. v. Henderson Bros., Inc.*, 268 N.W.2d 296, 299 (Mich. Ct. App. 1978)).

### 1.    Valid business relationship or expectancy

The defendants argue that the Kozlowskis cannot show that they had a valid business relationship or expectancy with Fox Financial. "[T]o establish a 'valid business relationship or expectancy,' there [must] be a showing of a 'contract or business relationship' between the plaintiff and an identifiable third party." *Landstrom*, 561 N.W.2d at 16 (quoting *Tibke*, 479 N.W.2d at 908). But " '[f]or this tort to occur, the business relationship, if in existence, need not be cemented by written or verbal contract and, whether or not it is in existence, it need not be intended that there be a contract.' " *Hayes*, 590 N.W.2d at 248 (quoting 45 Am. Jur. 2d *Interference* § 50 (1969)). Whether a business relationship or expectancy exists is a question of fact. *Tibke*, 479 N.W.2d at 909.

The Kozlowskis alleged to have a non-compete and non-circumvent agreement with Fox Financial. The defendants asked the Kozlowskis to produce the agreement through discovery. The Kozlowskis produced two documents representing written contracts. "The construction of a written contract is a question of law." *Alverson v. Nw. Nat. Cas. Co.*, 559 N.W.2d 234, 235 (S.D. 1997) (quoting *Bell v. E. River Elec. Power Coop. Inc.*, 535 N.W.2d 750, 754 (S.D. 1995)). The proper interpretation of a contract must give effect to the intention of the contracting parties. *Ziegler Furniture & Funeral Home, Inc. v. Cicmanec*, 709 N.W.2d 350, 355 (S.D. 2006). The language in a contract is

given its "plain and ordinary meaning." *Am. State Bank v. Adkins*, 458 N.W.2d 807, 809 (S.D. 1990).

The first document is titled as a "mutual confidentiality agreement." Docket 94-7. It was executed on July 6, 2008, by James on behalf of Bison and by Rooney on behalf of Fox Financial. The agreement governs the protection and dissemination of any confidential information disclosed between the parties. *See id.* at 1 ("[T]he Parties wish to protect their respective confidential information against any unauthorized use and any unauthorized or uncontrolled disclosure."). It contains several clauses that dictate the parties' rights and obligations toward the other party's confidential information. It does not, however, contain a non-competition or non-circumvention clause.

The second document is titled as a "mutual confidentiality & non-circumvention agreement." Docket 88-3. It was executed on October 2, 2007, by James on behalf of Stampede, LLC, by Perry on behalf of Kozlowski Group, LLC, and by non-party David Dorr on behalf of Life-Exchange, Inc. This document predates the Kozlowski-Rooney meeting in July of 2008 and neither Rooney nor Fox Financial or any Fox-related entity is a party to the agreement. Consequently, this agreement has no bearing on the Kozlowski-Fox Financial relationship. Thus, neither document supports the Kozlowskis' argument that they had a non-compete or non-circumvent agreement with Fox Financial.

Even without a signed non-compete or non-circumvent agreement, however, the Kozlowskis may still have a valid business relationship or expectancy with Fox Financial. *Hayes*, 590 N.W.2d at 248. Perry acknowledges

25

that he did not have a direct relationship with Fox Financial. Docket 86-2 at 14-15. James testified that he sought Rooney out as a potential purchaser of life settlements. Docket 86-3 at 6. James testified that he introduced Fox Financial to the defendants after Rooney and he signed the July 2008 confidentiality agreement. *Id.* at 7. According to James, Rooney and he executed the confidentiality agreement to protect their own business interests. *Id.* at 8. James testified that he viewed Fox Financial as his own client and that he would act as an intermediary between Fox Financial and the defendants. *Id.* at 20, 24. James testified that he would locate potential life settlement policies that Fox Financial might be interested in and then bring those policies to Fox Financial for purchase. *Id.* at 12. James testified that this arrangement was lucrative. *Id.* at 11.

Rooney testified that he did not consider his relationship with James to be a professional relationship. Docket 86-4 at 7. According to Rooney, the confidentiality agreement allowed him and James to speak openly about their businesses. *Id.* Rooney was asked about a number of correspondences sent in 2009 and 2010 concerning the potential sale of life settlement policies. *Id.* at 8-9. Although Rooney was included on those correspondences, he could not recall receiving them. *Id.* at 9. He also could not recall if he spoke with James on the phone after their meeting but prior to the instigation of this lawsuit. *Id.*

The court finds that whether in fact the Kozlowskis and Fox Financial had a valid business relationship or expectancy is a question for the jury. A jury could find that the Kozlowskis and Fox Financial mutually obtained an

26

economic advantage by virtue of their relationship. For the Kozlowskis, the jury could find that their benefit was derived from locating potential life settlement policies for Fox Financial. If those policies also involved the defendants, then the Kozlowskis could be entitled to a measure of compensation when Fox Financial purchased the policies or used the defendants' services. For Fox Financial, the jury could find that its benefit came from obtaining the policies identified by the Kozlowskis. Fox Financial could then treat the policies as an asset. The Kozlowskis and Fox Financial did not need to cement their relationship by a written or verbal contract nor did they need to intend to form a contract. *Hayes*, 590 N.W.2d at 248. Rather, "[t]he 'expectancies' this tort protects . . . is the prospect or opportunity of repeat and additional [business]." *Id.* at 250. Thus, the jury must determine whether such a relationship or expectancy existed.

### 2. Knowledge of the relationship

The defendants argue that the Kozlowskis cannot prove that the defendants knew about the Kozlowski-Fox Financial relationship. To establish this element, a plaintiff must show that the defendant either actually knew or should have known of the business relationship or expectancy. *Tibke*, 479 N.W.2d 908 (citing Restatement (Second) of Torts §§ 766 and 766B)). Whether a defendant knew about a business relationship or expectancy is a question of fact. *Id.* at 909. A party's description of their state of mind typically implicates their credibility, however, which is also an issue for the jury to consider. *See Gleason v. Peters*, 568 N.W.2d 482, 489 (S.D. 1997) ("It is the jury, not the

27

court, which . . . judges the credibility of witnesses[.]") (quoting *Fajardo v. Cammack*, 322 N.W.2d 873, 878 (S.D. 1982) (Wollman, C.J., concurring specially)); *Strassburg v. Citizens State Bank*, 581 N.W.2d 510, 517 (S.D. 1998) (explaining that "when Strassburg had actual or constructive knowledge of a claim" was an issue of fact for the jury).

Palmquist testified that "[the Kozlowskis] introduced Fox Financial to us." Docket 85-9 at 24. He testified that he did not believe Fox Financial was one of the Kozlowskis' clients. *Id.* Palmquist explained that he did not believe that "[i]t was [ever] part of our business arrangement. . . . And I never had an agreement with any of them that gave them any of kind rights to anybody." *Id.* at 27. Davies testified that he asked James if he could contact Fox Financial directly rather than going through James, although Davies also testified that he did not believe he needed James's permission. Docket 86-1 at 28. Meek agreed that the Kozlowskis represented that Fox Financial was their client, although he could not recall when that representation was made. Docket 86-5 at 22.

The evidence is disputed as to whether the defendants knew or should have known about the Kozlowski-Fox Financial relationship. It is for the jury to determine if there was, in fact, a valid business relationship or expectancy between the Kozlowskis and Fox Financial. And if the jury finds that a valid business relationship or expectancy existed, it is also for the jury to determine whether the defendants knew or should have known about that relationship. The jury will need to hear live testimony and judge the credibility of the

witnesses. Thus, the defendants are not entitled to summary judgment on the Kozlowskis' tortious interference claim.

### C.    Other issues

#### 1.    Claims against Palmquist as an individual

The defendants argue and conclude in a single paragraph that the Kozlowskis' claims against Palmquist in his individual capacity must be dismissed because he was acting at all times as an agent of the named entity defendants. Thus, he is entitled to limited liability protection. And according to the defendants, the Kozlowskis have not shown that the corporate veil of any of the named entity defendants should be pierced. The Kozlowskis respond that Palmquist has held himself out as an individual as well as a corporate actor.

"[A]s a general rule, a corporation is to be considered a legal entity separate and distinct from its shareholders, officers and directors unless and until there is sufficient reason to the contrary." *Brevet Int'l, Inc. v. Great Plains Luggage Co.*, 604 N.W.2d 268, 273 (S.D. 2000). A limited liability company is not a corporation but it affords its members limited liability protection like a corporation. *Smith v. Rustic Home Builders, LLC*, 826 N.W.2d 357, 359 (S.D. 2013). "The concept of limited liability is considered one of the central purposes for choosing the corporate form, because it permits shareholders to limit their personal liability to the extent of their investment." *Brevet*, 604 N.W.2d at 274. "[B]ut when the notion of a legal entity is used to defeat public convenience, justify wrong, protect fraud, or defend crime, the sufficient reason will exist to pierce the corporate veil." *Kanas Gas & Elec. Co. v. Ross*, 521 N.W.2d 107, 112

29

(S.D. 1994). The South Dakota Supreme Court considers several factors to determine if piercing the corporate veil is justified, such as: (1) fraudulent misrepresentation by corporate officers or directors; (2) undercapitalization; (3) failure to observe corporate formalities; (4) absence of corporate records; (5) payment by the corporation of individual obligations; and (6) use of the entity to promote fraud, injustice, or illegality. *Id.* at n.6. "[A] court should pierce the corporate veil only upon the strongest evidence of these factors." *Id.* at 113 n.9.

The court finds that the Kozlowskis have not shown that the corporate form of any of the named entity defendants should be disregarded so as to subject Palmquist to individual liability. The record shows that Palmquist is a member of North American, NANM, and Gardiner. There has been no showing that any of the defendant entities are undercapitalized, that their records have not been maintained, that funds from the entities have been used to pay for individual obligations, or that the entities have been used to promote fraud, injustice, or illegality. The record shows that all of the payments the Kozlowskis received came from bank accounts belonging to the defendant entities rather than Palmquist and that the transactions that are alleged to form the basis of the Kozlowskis' contract claim involved Fox Financial and the defendant entities rather than Palmquist individually. Similarly, the Kozlowskis' tortious interference claim is predicated on the defendant entities usurping the Kozlowskis' business relationship or expectancies with Fox Financial. There are no facts suggesting that Palmquist was acting as anything but an agent of the defendant entities. Therefore, the court grants Palmquist's summary judgment

30

motion and dismisses the Kozlowskis' claims against Palmquist in his individual capacity.

### 2.    Claims against the named defendants

The defendants argue that the Kozlowskis' claims against each of the defendant entities should be dismissed. Their argument is based on the court entering summary judgment in the defendants' favor. The defendants also single out Avanzar and argue that there are no facts suggesting that Avanzar was a party to any agreement with the Kozlowskis or that Avanzar was involved in the Kozlowskis' tortious interference claim.

The court disagrees. Regarding Avanzar and the breach of contract claim, there is a factual question whether Avanzar was responsible for making any of the payments owed to the Kozlowskis. As to Avanzar and the tortious interference claim, the facts suggest that Davies is Avanzar's principal and that Davies accompanied Palmquist to Texas in order to meet with Rooney. It is this meeting in Texas and the events that followed that form the basis of the Kozlowskis' tortious interference claim. Thus, there is a factual question whether Avanzar, through Davies, is liable for the Kozlowskis' tortious interference claim. And because the court has denied the defendants' summary judgment motion as to the breach of contract and tortious interference claims, the court also denies the other defendant entities' motions here as well.

### 3.   Perry Kozlowski

#### a.   breach of contract

The Kozlowskis' claims are brought on behalf of both Perry and James. The defendants argue that Perry is not a party to the alleged contract between the parties and therefore he is not a proper plaintiff with respect to the breach of contract claim. "Only parties to a contract have rights in the contract. As such, the parties to the contract are the only ones who can seek enforcement of the contract." *Mahan v. Avera St. Luke's*, 621 N.W.2d 150, 154 (S.D. 2001). Perry testified that he believed he was a party to the oral agreement with the defendants. Palmquist testified that he believed the agreement involved both Perry and James. The court has concluded that whether the parties had an implied contract and, if so, its governing terms are questions for the jury. Thus, the defendants' motion to dismiss Perry as a plaintiff from the breach of contract claim is denied.

#### b.   tortious interference

The defendants argue that Perry does not have a valid business relationship or expectancy with respect to Fox Financial and, therefore, that Perry is not a proper plaintiff with respect to the tortious interference claim. Perry testified that he does not have a relationship with Fox Financial. Docket 86-2 at 14 ("I had no relationship with Fox"). He testified that he never directly communicated with Rooney or Tuttle. *Id.* at 7. The court finds that Perry did not have a business relationship or expectancy with Fox Financial. Thus, the

32

court concludes that Perry is not a proper plaintiff regarding the tortious interference claim. Rather, the claim must be asserted solely by James.

### 4. Accounting

The defendants contend that the Kozlowskis' claim for an accounting should be summarily rejected because the defendants have disclosed a large number of documents through discovery. The defendants provide no legal authority for their argument, and the court has not found any authority supporting it. Thus, the defendants' motion for summary judgment on the Kozlowskis' accounting claim is denied.

## III.   The Defendants' Motion for Sanctions.

The defendants move the court for an order of sanctions under Rule 11 of the Federal Rules of Civil Procedure. They argue that sanctions are proper because counsel for the Kozlowskis failed to conduct a reasonable pre-filing investigation and because counsel continued to pursue the Kozlowskis' claims after it became clear that the claims are meritless.

### LEGAL STANDARD

Rule 11 provides in relevant part:

(b) Representations to the Court. By presenting to the court a pleading, written motion, or other paper—whether by signing, filing, submitting, or later advocating it—an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:

> (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;

33

> (2) the claims, defenses, and other legal contentions
> are warranted by existing law or by a nonfrivolous
> argument for extending, modifying, or reversing
> existing law or for establishing new law;
>
> (3) the factual contentions have evidentiary support or,
> if specifically so identified, will likely have evidentiary
> support after a reasonable opportunity for further
> investigation or discovery; and
>
> (4) the denials of factual contentions are warranted on
> the evidence or, if specifically so identified, are
> reasonably based on belief or a lack of information.

Fed. R. Civ. P. 11(b). The general standard for imposition of Rule 11 sanctions

is that the conduct of a party or its counsel was objectively unreasonable.

*Black Hills Inst. Of Geological Research v. S.D. Sch. of Mines & Tech.*, 12 F.3d

737 (8th Cir. 1993). "If, after notice and a reasonable opportunity to respond,

the court determines that Rule 11(b) has been violated, the court may impose

an appropriate sanction on any attorney, law firm, or party that violated the

rule or is responsible for the violation." Fed. R. Civ. P. 11(c)(1). A district court's

determinations concerning Rule 11 are reviewed for an abuse of discretion.

*Clark v. United Parcel Serv., Inc.*, 460 F.3d 1004, 1008 (8th Cir. 2006).

## DISCUSSION

Before filing a motion for sanctions with the court, parties must also

adhere to the "safe harbor" provision of Rule 11. The Rule provides that a

motion

> must be served under Rule 5, but it must not be filed or be
> presented to the court if the challenged paper, claim, defense,
> contention, or denial is withdrawn or appropriately corrected
> within 21 days after service or within another time the court sets.

Fed. R. Civ. P. 11(c)(2). The Advisory Committee notes explain that

> The motion for sanctions is not, however, to be filed until at least 21 days . . . after being served. If, during this period, the alleged violation is corrected, as by withdrawing (whether formally or informally) some allegation or contention, the motion should not be filed with the court. These provisions are intended to provide a type of "safe harbor" against motions under Rule 11 in that a party will not be subject to sanctions on the basis of another party's motion unless, after receiving the motion, it refuses to withdraw that position or to acknowledge candidly that it does not currently have evidence to support a specified position.

Fed. R. Civ. P. 11, Advisory Committee Notes (1993 Amendment). The rule makes clear that a party must first serve its motion for sanctions on the opposing party and then wait to file the motion with the court until the 21-day grace period has elapsed. *Kirk Capital Corp. v. Bailey*, 16 F.3d 1485, 1488-89 (8th Cir. 1994). The failure to comply with Rule 11's procedural requirements is grounds for denial of the motion for sanctions. *Gordon v. Unifund CCR Partners*, 345 F.3d 1028, 1030 (8th Cir. 2003).

Here, the defendants did not comply with the safe harbor provision of Rule 11. Counsel for the Kozlowskis' has submitted a copy of an email sent by defendants' counsel at 1:56 p.m. on October 13, 2015, stating that "we are moving the Court to grant sanctions pursuant to Rule 11" and that they "would welcome the opportunity to discuss voluntary dismissal of Plaintiffs' claims, if Plaintiffs are interested." Docket 103-1 at 1. Counsel for the Kozlowskis has attested to the accuracy of the email. Docket 103. The defendants' motion was filed with this court at 8:50 p.m. on October 13, 2015. Docket 95.

The defendants contend that the October 13, 2015 email was not the first time they discussed filing a motion for sanctions with counsel for the Kozlowskis. The defendants have not cited any part of the record, however,

35

substantiating their claim. Regardless, the Eighth Circuit has held that warning letters and emails are not a substitute for compliance with Rule 11's safe harbor provision. *Gordon*, 345 F.3d at 1030 (citing *VanDanacker v. Main Motor Sales Co.*, 109 F. Supp. 2d 1045, 1055 (D. Minn. 2000)). To the contrary, " '[t]o stress the seriousness of a motion for sanctions and to define precisely the conduct claimed to violate the rule, the revision provides that the 'safe harbor' period begins to run *only upon service of the motion*.' " *Id.* (quoting Fed. R. Civ. P. 11, Advisory Committee Notes (1993 Amendment) (emphasis added). The court finds that the defendants did not serve their motion in accordance with the procedural requirements of Rule 11.

Moreover, the court denied the defendants' motion for summary judgment on the Kozlowskis' breach of contract and tortious interference claims. The court does not consider the Kozlowskis' claims "so baseless as to warrant Rule 11 sanctions." *Exec. Air Taxi Corp. v. Bismarck, N.D.*, 518 F.3d 562, 571 (8th Cir. 2008). Thus, the defendants' motion for sanctions is denied.

## CONCLUSION

The court finds that the Kozlowskis did not diligently attempt to comply with the court's scheduling order. The court finds that whether the parties had an implied contract is a question for the jury. Similarly, the court finds that whether James had a valid business relationship or expectancy with Fox Financial and, if so, whether the defendants knew of that relationship or expectancy are questions for the jury.

36

The court concludes that the Kozlowskis have not demonstrated that Palmquist should be subject to personal liability and, therefore, Palmquist is dismissed as a defendant in his individual capacity. The court concludes that the Kozlowskis' claims against the named defendant entities will not be dismissed as a matter of law. The court finds that whether Perry is a party to the agreement between the parties is a question for the jury, but the court also concludes that Perry is not a proper plaintiff regarding the Kozlowskis' tortious interference claim. The court concludes that the Kozlowskis' cause of action for an accounting will not be dismissed. Finally, the court denies the defendants' motion for sanctions. Thus, it is

ORDERED that the Kozlowskis' motion to amend the amended complaint (Docket 79) is denied.

IT IS FURTHER ORDERED that the defendants' motion for summary judgment (Docket 81) is granted in part and denied in part.

IT IS FURTHER ORDERED that the defendants' motion for sanctions (Docket 95) is denied.

DATED this 29th day of March 2016.

BY THE COURT:

*/s/ Karen E. Schreier*

KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE